4th case of this morning, the United States v. Lola Chang and A. Lau, numbers 19-3500 and 20-11-11. And we'll begin with, we're going to start with Mr. Donovan. Mr. Donovan, good morning. You may proceed. Good morning. Thank you, your honor. And may it please the court and opposing counsel and co-counsel. I'll be making the argument on behalf of both appellants for the illegal stop and seizure. Terry v. Ohio makes clear that people cannot be stopped by police based on mere hunches, but that's really what occurred in this case. While the officer may at first have been responding to what he perceived as a roadside emergency, where the appellants were both stuck in a car during a snowstorm, any safety concerns were immediately resolved when he determined both occupants were unharmed and had a tow truck on the way to help get them out of the snow. At that point under Rodriguez, the officer's mission had ended and all actions that were taken thereafter prolonged the stop and made the stop illegal. The officer admitted he could have just sat in his squad at that point and waited for the tow truck to appear and that he's done exactly that in the past for other motorists. But he did not do that because he, quote, had a hunch something was going on and the district court credited that by finding that his, quote, suspicions were aroused. So the officers, after the fact justification that he was investigating a traffic stop that was presented for the first time at the hearing in this matter several months later, should not be accepted by this court. So Mr. Donovan, is it your... I'm sorry. No, go ahead. Go ahead. Mike, my question is, is it your position that the police officer with the car in the ditch during the snowstorm offended the First Amendment by asking for a form of identification? Or put differently, when precisely did the Fourth Amendment violation occur? I believe the Fourth Amendment violation occurred when he knew they were no longer in danger. They had help on the way. So there was no safety concern. This is not community caretaker at that point. His knowledge doesn't, it's not knowledge that violates the Fourth Amendment. It's some act that he took. What's the act that he took that violated the Fourth Amendment? So the act, I think it's twofold. This court has said in Noble, the case that's cited in our brief, that when they take, when police take a person's documents that they need to go on their way and give commands that indicate that compliance may be compelled, that's a seizure. So I believe when he took their driver's licenses and identifications and basically, and again, he admits this, he told them, stay in the car, he's now seized them. And I think that's clear under Noble. And under Odom, another Seventh Circuit case, it is clear that the relevant timeframe to determine whether or not the seizure was legal is limited to when it occurred. Nothing that occurred after, no matter how compelling, can justify the seizure at that point. But here's what the officer has. He has a car that it's been spun out of control onto the roadway, you know, in a ditch, right there. Doesn't that justify a brief detention to see if there have been any traffic violations? Like, for instance, is the driver intoxicated? So, you know, so they run the license to see if the driver has a history of DUI. Once the officer did that, he would have developed the same articulable suspicion and probable cause that he did for the short detention while he ran the place. I think, you know, did, I mean, didn't he have a reasonable suspicion to seek information on the driver just because the car had spun off the road and into a ditch? I don't believe so. He did not observe the car spin off the road. He didn't know if that was related to a traffic violation. He said he first stopped for community caretaker. Again, that resolved almost immediately. And at that point, again, he admitted on the record, this is document entry 35 at, I'm sorry, document entry 52 at page 41. This is also appendix page number 21. He said that he had a hunch quote, something was going on. That's his reason for seizing them and for taking their identification and telling them to stay in the car. He articulated no traffic stop. He didn't mention it in any reports that he wrote. He did not tell any of the other responding officers on scene about a suspicion of a traffic violation. He wrote no traffic tickets. There was, there was, that was not the reason that he stopped them. Is the inquiry subjective or objective under the fourth amendment? I believe it's an objective analysis. So what difference does it make what he, what he, what he was running through his mind or not running through his mind? Because again, there's no indication that there was any investigation of traffic violations here and someone can spin off the road and be in the snow without one. And he did not observe one. Yeah, but Judge Rovner's, Judge Rovner's, I mean, her question is, so what, what is he to do? He sees a car in the ditch in these circumstances. They say, we've called a tow truck officer. He's just supposed to get in his car and drive along? No, I think he does what he says he's done before with other people in that situation. He, he goes back to his squad and wait and sees if they get out okay. So your position has to be that the fourth amendment compels that, that his constitutional rights are violated. Your, her constitutional rights for your client are violated by asking for her driver's license. I think they're violated when she's not left to be alone. When, when there's a community caretaker. She's got to be more specific than that. I don't know what that means to be alone. You mean he's not even able to walk to the window of the car? No, he, he did. He, he walked, he verified that no one's harmed, no one's in danger. And at that point, his, his mission under Rodriguez resolved. And so that's the point where he had no basis to seize them. And that's exactly what he did by taking their IDs and indicating that they had to comply by staying in the vehicle and going back and running things. At that point, it was resolved. He should have gotten back in his squad car, confirmed that, you know, if he wants to, the tow truck comes and gets him out. And then, and that, and that's that. Our court has held that the police may check driver's license plates, even without a reasonable suspicion for, you know, for example, in the case of occupants in a car that has been stopped for his speeding violation. Correct. And that's different because there, there is a law violation being observed in that situation. Here, there was not. Here, they had just slid off the road that that's not an automatic law violation. They're stuck in the snow. That's not unusual in Wisconsin in winter. And the officer determined that no one was in danger and there was no further need for community caretaking and to seize them. So that's why we believe that violated the Fourth Amendment. I do want to reserve my time for rebuttal. And I also don't want to cut too much into attorney Hunt's time unless anyone else has further questions. No, very well, Mr. Donovan. Thank you. Thank you, Mr. Hunt. Good morning to you. We'll hear from you now. Good morning, your honors. May it please the court. I represent Illao before this court, not only on the Fourth Amendment violation that Mr. Donovan presented on and wrote on, and I joined in my brief, but I represented Mr. Illao, not only at the motions to suppress, but I also represented him before a jury. At that jury, the government, to be more precise, before the jury had filed a motion to make a motion, made by the co-defendant, Lola Chang. And I responded to that in pleadings. And just to kind of set forth the background, Chang was arrested holding a safe that contained a substantial quantity of methamphetamine and drug distribution paraphernalia. Illao was found to be only holding the key to the safe. Chang initially told Lieutenant McCauley she did not know who owned the safe and agreed it was abandoned. Now, later in an interview with Brown County Sheriff Sergeant Christopher Tappan on March 2nd, 2019, after being advised of Miranda rights, Chang said the safe was all hers, in quotes, but could not describe the contents of the safe and did not know when any drugs were placed into it. Chang also said during the Sergeant Tappan interview, and this is important, quote, I don't know whatever you just found in the car is mine. Everything you found in the car is mine. He had nothing to do with it, end of quote. And in response to Sergeant Tappan's further questioning, she said regarding any criminal items found in the car, she declared, quote, all mine. Now, those statements were made as by way of an offer of proof in the government's motion in limine, but also in the defense proper. Now, the real question here falls down to whether the court, the district court, erred in application of evidence 804B3. Under that rule, a hearsay statement may be admissible in a criminal condition, a criminal case, rather, if three conditions are met. First, the declarant is unavailable as a witness. Second, the statement was against a declarant's penal interest when made, and corroborating circumstances clearly suggest that the statement is trustworthy. Now, it's recognized that the proponent, and Law would be the proponent of the hearsay statement, bears the burden of demonstrating that each of these elements is satisfied. Your Honors, it is Law's submission before this court that he not only met those three conditions for admission of the hearsay statements, but he exceeded those, and that's because of the special circumstances of this case. Now, to be more precise, it is Law's belief that the district court erred because it failed to weigh here the unique set of facts which demonstrate corroboration and trustworthiness. And to cut to the chase, it's what happened after this trial began. As the trial was just underway on October 7th, 2019, outside the presence of the jury, the district court granted the government's motion in limine seeking to bar the admission of Chang's out-of-court statements, exculpating Law and rejecting Law's arguments in his response pleading that Chang's out-of-court statement should be admitted. The district court reasoned that Chang's statements that the drugs, quote, were mine, end of quote, did not fit the definition of statements against. Mr. Hunt? Occurred before Chang took the witness. Mr. Hunt? Yes, Your Honor. Okay. Can you rewind maybe the last 30 seconds and restate the point you're making? The feed is a little bit blurry on our end. I'm sorry, Your Honor. I'll be happy to. No need to apologize. We want to make sure we don't miss your point. The district court reasoned that Chang's statements that the drugs, quote, were mine, end of quote, did not fit the definition of statements against her interests. The district court noted that Chang had pled guilty, but all of this occurred before Chang took the witness stand. When Chang took the stand under oath, the district court's analysis should have changed with the change in circumstances. Chang is called to the stand outside the presence of the jury, and it's my submission, Your Honors, that the wind was starting to shift against the government as it relates to admission under 804B3, and in favor of finding of a corroboration and trustworthiness of her original statements. And this is because now when she gets on the stand, she says she will not plead the Fifth Amendment, anything less than sending a clear signal and message that she wants to do the right thing and exculpate Lau. Attorney Eric Michalak was standing in for Attorney Donovan at that point and was representing Chang in court. Now, later that same day, and this is important, Chang is called to the stand again. Now, according to the government's trial attorney, Chang, the court, the district court, has changed her mind about testifying. Now, Attorney Michalak informs the district court he believes Chang's going to invoke her Fifth Amendment right. Under oath, in response to a question from Attorney Michalak, she says she will invoke her Fifth Amendment right not to incriminate herself. But in response to questions from the district court, she expresses a belief that she is being threatened. She goes on to say, quote, and this quote is very important to Lau's position, quote, that wasn't my gun. I'm taking ownership of the drugs. It's all mine. I can provide proof. They have my cell phone. I can obviously unlock it. I can provide you guys valuable information on the whole operation of operation on the drugs. Now, when the district court asked her if it's her intention to testify in this case or exercise her Fifth Amendment right to avoid self-incrimination, she says at that point, my intention is to take ownership of all of the drugs. The gun is not mine, though. I didn't have no knowledge of the guns. Okay, Mr. Hunt. I think we understand your position and appreciate your argument this morning. Let's hear from Mr. Koenig on behalf of the government. Thank you, Your Honor, and good morning. My name is Jonathan Koenig, and I appear on behalf of the United States this morning. The court should affirm the defendant's convictions because there was no Fourth Amendment violation warranting suppression of the drugs or the gun found in the defendant's car and because the district judge correctly found that Chang's hearsay statements exonerating Lau lacked corroborating circumstances that clearly indicated their trustworthiness. As for the first issue, I'm puzzled by my opponent's reliance on the Rodriguez case that was a Supreme Court decision involving a dog sniff in which the officers, after they had completed issuing a traffic citation, had everybody wait while they brought a dog, a drug sniffing dog, to the scene. And the Supreme Court said you couldn't do that, at least not without reasonable suspicion of drug activity. And that wasn't what happened in our case, factually. But more importantly, Justice Ginsburg, writing for the court, explained that there are ordinary and permissible incidents of a traffic stop like this one. Specifically, the officer can check the driver's license, determine whether there's any outstanding warrants, look at the insurance card, and so forth. The court said that these measures serve the same objective as enforcement of the traffic code, ensuring that vehicles are operating safely on the road. As the Rodriguez court also made clear, these measures are appropriate to protect officer safety. And I'm quoting here from Rodriguez, Rodriguez, an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely. This court said very much the same thing in Sanford. Suppose Lau and Chang had a flat tire. Would the officer have had reason to check for warrants in prior criminal history? I'm not sure that he would have, Your Honor, because there wouldn't be any indication in that violation. Here, there was. The car was spun out on the side of the road, and so there was at least evidence of a possible traffic violation that the officer was entitled to investigate. If somebody were merely replacing a tire and they weren't on the shoulder or otherwise committing any sort of violation, and said to the officers, we have everything in hand, again, absent any other indicia of unlawful behavior, I think it might be impermissible to seize them under those facts. But again, this was a brief detention of the Terry variety, and it was commensurate with what the officer was doing. I mean, although, of course, I understand the totality of the circumstances test. I am wondering, which of these factors really gave rise to a particularized basis for this job or more than just a hunch? No one seems to mention the fact that most people would be nervous wrecks if their car had just gone off the highway into a ditch. What made these two different from other people who had just been in an accident? Well, I believe the record reflects that some period of time had elapsed since the accident. I want to say 45 minutes. My colleagues will correct me if that's wrong. So they had some time to calm down, but they weren't calm. And again, the government is not arguing that the officer could detain them for being nervous. I want to be very clear about that. Their odd behavior and their nervousness comes into play, of course, when the officer runs their ID and finds that they're on paper for recent drug violations. Did I answer your question, Judge Rodner? Well, I mean, to be honest, I think a lot of people would be even more nervous. You know, here we are sitting in a ditch. I don't know. Well, the officer testified that usually people are glad to see him. And of course, you can imagine situations where that's not true. I've tried not to invest too much of my argument in the nervousness because, again, I don't think that comes into play until after the officer learns about their history. And then it's permissible for him to put two and two together under a totality test and say, maybe I need to get another officer on the scene. Maybe I need to do a little more investigating. Mr. Koenig, at the risk of oversimplification, why does the Fourth Amendment analysis not begin and end with an officer's ability under the Fourth Amendment when he sees a car in a ditch to approach the car and, among other things, making sure people are safe, ask for their driver's license? Why is that not reasonable within the meaning of the Fourth Amendment? Why do we have to ask a question about a suspicion or lack thereof of illegal conduct? Well, I think it is that simple. Here you have both the safety rationale, he's investigating whether these people are OK, and also whether there's been a traffic violation. So from the perspective of a police officer, I don't think it's unreasonable for a police officer to say, sure, I'm happy to help you. Can you show me your driver's license? And I'll be right back to help you. I don't understand why that would violate the Fourth Amendment. Well, Sanford says it doesn't. So if we're talking strictly about precedent, that case would seem to control. You know, as a practical matter, reasonableness being the touchstone of any Fourth Amendment inquiry, we don't want to make these situations too complicated for officers because we want them to help people and we want them to enforce the traffic code. I mean, in fairness to Mr. Donovan and Mr. Hunt, there is no question that there is a difficult line in identifying where that line is crossed between when law enforcement ceases undertaking action in the name of this community caretaker function that the Supreme Court has recognized and when we start to enter Terry. I think that is a difficult line. But here, when you're talking about people in ditches or cars tipped over or people just, you know, pulled over on the side of a highway, it seems plenty reasonable for a police officer to stop instead of keep driving. And then as one of the first activities she or he undertakes to ask for a form of identification, it seems pretty reasonable for a police officer to stop and ask for a form of identification. And that's all we have in front of us in this fact pattern. Well, I mean, I agree with you. My opponents are the ones who are trying to layer on additional questions, I guess, based on the way that this encounter evolved. Um, no, my, my, the only reason I'm absorbing the comment is you, you tend to, you tend, I don't understand why I'm not criticizing you. You under, you tend to drift toward this notion that there's a statute on the books that prevents hazardous driving. And I understand why you want to point to that. And the reason I'm pressing you a touch on this is my question is, does the Fourth Amendment even require you to go that far in a situation where you have a car in a ditch and a police officer driving by that sees it? Right. And, and I'm not trying to avoid your question, but I think because we did have evidence of a possible traffic violation in this case, I didn't do a lot of research on community caretaking function. And I, you know, the hypothetical that Judge Rodner asked was about somebody who was having a mechanical difficulty, which again, would be different because presumably nobody's hurt in that situation. Right. But if somebody has gone off the side of the road, um, presumably we want police officers to check that out and see, make sure everyone's okay. Um, there's no doubt about that. How about people that pull over because they're ill, feel like they're having a heart attack? Absolutely. You know, and again, I'm drifting into Terry land here, but there's all kinds of reasons people could spin out on the side of the road, including drunk driving, which was mentioned earlier. Um, and stopping to investigate that is perfectly reasonable under the Fourth Amendment. And there wasn't any kind of, um, attenuation of the stop that of the kind that the Rodriguez court said was, would be impermissible. Um, so I think just to return to a point that I was making earlier, Rodriguez helps the government in this case. It's not a case that particularly helps, um, the defendants. And I would invite you to read what the court said at pages 355 and 356 of the U S reports, uh, volume five 75, uh, about the things that well, I have to tell you, I think there's a thought provoking, uh, aspect to this case because one might imagine that safety and care oriented highway, uh, patrol service, um, uh, whose only job, uh, was to ensure that cars that were in trouble got to safety. And, um, in that case, uh, there would be no reason, uh, to run someone's driver's license or plates before, uh, offering assistance. Uh, this case, uh, uh, even if there were such a care and safety, uh, oriented patrol, uh, uh, an officer, uh, might also arrive at the scene, uh, to, uh, try and determine whether any traffic violation had occurred here. Of course, we have a car that had spun out of control onto the roadway and, um, it would seem that that in and of itself would justify a brief detention to see if there had been any traffic violations. As I noted earlier, you know, if a driver was intoxicated, exactly. It's not, you know, it's not a one fits all proposition in my view. Well, and you know, it's possible to hypothesize innocent reasons that a car could spin out during a snowstorm. I've had that happen to me without any, you know, bad conduct on my part, but, uh, you'd say that's what I said. I'm sticking with that story judge. Um, but under the reasonable suspicion standard, of course, the officers don't have to, you know, assume that the innocent explanation is the only one. Um, I hadn't planned to say very much on the hearsay issue under 804B3. Um, the, the standard of review is very deferential and, uh, in the government's view, Judge Griesbach, you know, this isn't a case where I'm coming before you and saying, well, it was a close call, but the standard of review is deferential. So you should defer to the trial judge. We think the ruling was absolutely correct. And, um, because it was correct, it can't be an abuse of discretion, but it certainly isn't one that should strike you as fundamentally wrong. Um, there's a bunch of reasons to regard these, um, hearsay statements as unreliable. Uh, they contradicted each other. They were internally inconsistent, and they were made by someone with a, um, a strong relationship with the other person. So, uh, the person she's trying to exculpate. Um, so I'm happy to answer questions on that second issue or, of course, the Fourth Amendment issue. I'm hearing none. The court thanks you, uh, Mr. Koenig, and let's, um, return to Mr. Donovan. You've got, uh, just under two minutes. Thank you, Your Honor. Um, just to be clear, we don't quibble with the fact that the officer stopped to investigate and check on their safety. We agree that that was appropriate, and that's something that we want police to do. Um, and I think we agree with the government that Rodriguez bears careful reading. And so to address both, uh, the government's, uh, question or puzzlement, and also Judge Scudder to address one of your questions, the part I'm relying upon in Rodriguez is at pages, uh, 354 and 55. And I cite this pretty extensively on page five of my reply brief. And so this is the part that I think, um, is really what controls here. It says that, um, the tolerable duration of police inquiries in the traffic stop context is determined by the seizure's mission, which here was to address safety concerns. Authority for the seizure thus ends when tasks tied to the mission are, or reasonably should have been, completed. Absent a reasonable suspicion ordinarily demanded that justifies detaining an individual, officers must not take action that prolonged the stop. Um, that's the part that I think is in tension with Sanford, which says, well, you know, you can ask for people's identification, uh, even without reasonable suspicion. I think Sanford has to yield to Rodriguez on that point. And so here he stopped, he checked on them and that's great. We want that. He confirmed they were not in, in harm, no injuries. There was a reasonable suspicion at that point to take their identification and order them to stay in the car. And that's where the illegal action occurred because under Rodriguez, the, the mission ended and should have stopped. Um, so I, I just, I guess I wanted to clarify that I agree with the not, not supports the government. Um, I don't know if any time's left for attorney Hunt, but I don't want to take all the rebuttal if he has anything else to say. Um, Mr. Hunt, you used your time, but we'll give you a minute if you have, um, a point or so you want to make to us in closing. Yes, your honor. Um, I think careful reading of the United States versus Nagib is necessary. Um, because in Nagib you had just the statement of co-defendant Dumont that was viewed as exculpatory to Nagib. And yet the court there found a relationship between the declarant, the exculpated party address, whether the statement was voluntary given after Miranda warnings, whether there's any evidence, the statement was made to curry favor with the this or Chang makes these statements on the stand under oath corroborating what she told the police out of court. And it would have been a far different trial if those statements had been introduced. Farrell isn't even on point here. Farrell's co-defendant was, was sending out emails and, uh, voicemails here. Lau was in a courtroom under oath corroborating. So I think they were trustworthy. Okay. Uh, thank you for all counsel. The court will take the case under advisement.